**ARKLA, INC.**

v.

**UNITED STATES of America.**

**Civ. A. No. 82–2437.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Aug. 6, 1984.

Lawrence L. Jones, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for plaintiff.

Steven Shapiro, Chief, Civil Trial Section, Southern Region, U.S. Dept. of Justice, Tax Div., Washington, D.C., Joseph Shelby Cage, Jr., U.S. Atty., U.S. Dept. of Justice, Shreveport, La., for defendant.

## MEMORANDUM RULING

STAGG, Chief Judge.

### INTRODUCTION:

This case involves an action by Arkla, Inc., seeking a refund of United States income taxes paid for the tax year 1980. The amount of the refund requested is $1,129,746.37. This request was filed with the Internal Revenue Service on September 16, 1981 in the form of an amended corporate income tax return, Form 1120X. The IRS determined that a refund was not proper, and denied Arkla's request. This lawsuit followed in October 1982.

Pending for determination are cross motions for summary judgment. It was de-termined at a pretrial conference that there were no genuine issues of material fact, and that the resolution of this dispute hinged on a determination of law to be made by this court. For the reasons set forth below, the motion for summary judgment on behalf of Arkla, Inc. is GRANTED, and the government's motion for summary judgment is DENIED.

### STIPULATED FACTS:

In the pretrial order filed by the parties in December 1983, extensive fact stipulations were set forth which provide a thorough background of this income tax refund dispute. In addition to the stipulations of fact, the parties include a helpful list of definitions explaining terms involved in the case. The stipulated definitions are as follows:

1. "Cushion gas" is natural gas contained in a gas storage facility which provides a minimum pressure for the facility. This gas is sometimes referred to in the gas industry as "base gas."

2. "Working gas" is natural gas contained in a gas storage facility which is stored for delivery into a gas transmission system at times of high demand, principally during the winter heating season, and which will be replaced at times of low demand, principally during the summer season. This gas is sometimes referred to in the gas industry as "top gas."

3. "Native gas" is natural gas contained in a gas storage facility which was present in an underground reservoir at the time such reservoir was acquired or converted for use as a part of a gas storage facility.

4. "Injected gas" is natural gas contained in a gas storage facility which has been injected into the facility from some outside source.

5. "Non-recoverable gas" is natural gas contained in a gas reservoir which cannot be economically withdrawn.

With these stipulated definitions, a reasonably clear understanding of the dispute can be gained from the following 41 stipu-

lated facts extracted verbatim from the Pretrial Order:

1. Plaintiff is an integrated natural gas company, within the meaning of the Natural Gas Act, subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC").

2. In a continuing effort to meet the needs of providing gas service to its more than 650,000 customers in its five state service area of Arkansas, Kansas, Louisiana, Oklahoma and Texas during winter heating periods, the Plaintiff, in 1976, made an extensive reevaluation and update of its gas storage needs and concluded that its minimal projected future needs would be for an additional 12 billion cubic feet ("BCF") of stored working gas with daily deliverability of approximately 240 million cubic feet ("MMCF").

3. As a part of its ongoing studies, by early 1977 the Plaintiff had evaluated approximately 50 potential storage reservoirs in its service area which were reasonably accessible to the Plaintiff's major transmission lines, but had not located any significant prospects meeting its general specifications for a gas storage facility.

4. In January of 1977, the Plaintiff engaged the services of Keplinger and Associates, Inc. of Tulsa, Oklahoma to assist with the further search and evaluation of the potential gas storage prospects, particularly analyzing reservoirs which were reasonably accessible to one of its major transmission lines.

5. Under letter of July 22, 1977, Keplinger and Associates advised the Plaintiff of three potential prospects meeting its general specifications: Centrahoma 1 (McLisk formation), Centrahoma (Oil Creek formation), and Chiles Dome (Wapanucka formation).

6. Pursuant to Plaintiff's request, Keplinger and Associates prepared and furnished in November 1977, a comprehensive geological feasibility study for converting the Chiles Dome reservoir into a gas storage facility.

7. The results of the Keplinger study and the Plaintiff's research into all aspects of its gas storage facilities were consolidated and formalized in the January 1978 publication by the Plaintiff's Long Range Planning department entitled "A Definition of Future Underground Storage Needs and a Recommended Plan for Meeting These Needs." The January 1978 report, which took into consideration the further expansion of an existing gas storage facility owned by Plaintiff, located near Ada, Oklahoma (the "Ada Storage Facility"), which had previously been expanded in 1976, revised the Plaintiff's minimum additional storage needs and set as a goal the addition of storage capacity sufficient to increase peak deliverability by 150 MMCF per day and to store an additional 14.2 BCF of working gas.

8. The recommended plan set forth in the January 1978 study to meet the new storage goals was for the purchase of the Chiles Dome reservoir and the construction and development of the Chiles Dome gas storage facility in Eastern Oklahoma, and the connection thereof with the Plaintiff's existing transmission system, together with a further expansion in the capacity of the Ada Storage Facility.

9. From the inception of the Chiles Dome studies, projections of the optimal cost of service for each prospect were determined, taking into consideration the varying factors and costs, including but not limited to the cost of various quantities of cushion gas and inversely the quantity of surface compression horsepower required; those projections for the Chiles Dome reservoir were set forth in the January 1978 report of the Long Range Planning department.

10. The authorization to commence with a more detailed study of both the technical (geological and engineering) and economic feasibility of converting the Chiles Dome reservoir into a gas storage facility was given in February 1978 and contact with the operator of the Chiles Dome field was made to secure initial source data.

11. The Plaintiff began the acquisition and review of the seismic data and well operational data of the Chiles Dome reservoir in the Spring of 1978.

12. The initial outward step in the acquisition and construction of the storage facility was the acquisition of the storage rights and necessary surface acreage, which actions included the following:

A. After negotiations with the five principal owners of the surface acreage under which the Chiles Dome reservoir lay (A.D. Cody and his wife, Joy Cody; Phillip R. Cody and his wife, Cynthia Cody; and N.B. Hunt), Plaintiff acquired, by Gas Storage Agreement dated June 13, 1978, from A.D. Cody, Joy Cody, Phillip R. Cody and Cynthia Cody for the cash consideration of $283,082.40 ($80.00 per surface acre) the right to inject natural gas into the Wapanucka Zone underlying 3,538.53 acres described in the Gas Storage Agreement, the right to store natural gas therein, to withdraw and produce gas therefrom and to do all things necessary in the construction and operation of a gas storage facility. Plaintiff was required, however, to pay the vendors the additional sum of $1,100.00 for each well drilled on the 3,538.53 acres and $10.00 per rod, or $666.00 per acre, for surface damage resulting from laying pipelines upon those properties or for other damages thereto.

B. After further negotiations, by Gas Storage Agreement dated September 27, 1979, Plaintiff obtained from N.B. Hunt for the cash consideration of $115,092.00 ($80.00 per surface acre) similar rights as had been obtained from the Cody family, namely the right to inject natural gas into the Wapanucka Zone underlying 1,438.65 acres described in the Gas Storage Agreement, the right to store natural gas therein, to withdraw and produce gas therefrom and to do all things necessary in the construction and operation of a gas storage facility. Plaintiff was required, however, to pay N.B. Hunt the additional sum of $1,000.00 for each well drilled on the 1,438.65 acres and $8.00 per rod, or $533.00 per acre, for surface damage resulting from laying pipelines upon those properties or for other damages thereto.

C. By warranty deed dated June 13, 1978, Plaintiff acquired from A.D. Cody and Joy Cody fee title to a 40 acre tract of land located in the East 20 acres of Lot 4 and West Half of the Southeast Quarter of the Southwest Quarter (W/2 of SE/4 of SW/4) section 19, Township 3 North, Range 10 East, Coal County, Oklahoma, for the cash consideration of $40,000.00, subject to the specific right of reversion to the vendors of the property upon abandonment of the gas storage facility underlying the property, which property was acquired by Plaintiff to serve as the primary surface compressor site for the Chiles Dome gas storage facility.

D. For the total cash consideration of $3,200.00, Plaintiff acquired storage rights, and associated leases, from the remaining land owners similar to those acquired from the Cody family and Mr. Hunt.

13. By an Assignment and Bill of Sale, dated June 13, 1978, Plaintiff acquired from A.D. Cody, for the cash consideration of $10.00, all of his right, title and interest in and to the Cody Gas Unit III, Well No. 1.

14. Plaintiff acquired from Elliott Davis, and others, for the cash consideration of $9,514.00, all of the owners' right, title and interest in and to the Davis Brothers-Cody Well No. 1 and the leases associated therewith covering approximately 137 net mineral acres.

15. On September 27, 1978 the Plaintiff applied to the FERC (FERC Docket No. CP78–540) for a temporary emergency certificate for authority to drill five test wells to confirm and develop additional reservoir data; the temporary certification for the five test wells was granted on October 26, 1978 with permanent au-

thorization being granted pursuant to order dated December 15, 1978.

16. On October 6, 1978, the Plaintiff's Long Range Planning department published a Summary Report on the Chiles Dome Project in which each of the three major phases of the project, the construction of the gas storage facility itself with all of its component parts, the modification of 16.7 miles of Line "O" Loop, and the installation of a 4,250 horsepower compressor at the Chambers, Arkansas compressor station, were evaluated and various options analyzed.

17. On October 31, 1978, the Plaintiff filed its Original Application for Certificate of Public Convenience and Necessity (FERC Docket No. CP 79–47), in which authority to construct the Chiles Dome Project was sought to consist of the following facilities: (a) the acquisition of storage rights, working interests and necessary surface acreage; (b) 20 injection-withdrawal wells (15 new wells to be drilled and 5 existing wells to be reworked) and one observation well; (c) a 6,750 horsepower compressor station; (d) a central point facility to perform measurement, pressure regulation, dehydration, liquid separation and other similar functions; (e) approximately 6.38 miles of 6″ to 12″ gathering lines to connect the wells to the compressor station; (f) approximately 11.14 miles of 16″ pipeline to connect the compressor station to Plaintiff's existing transmission system; and (g) 14.0 BCF of cushion gas. In addition to the storage facilities incident to the Chiles Dome storage facility itself, the application also sought authority to construct 16.7 miles of 30″ O.D. loop line paralleling one of Plaintiff's existing pipelines and a 4,250 horsepower centrifugal compressor station at a site in Northwest Arkansas to accommodate the additional deliverability volumes that would be available when the Chiles Dome storage facility became operational.

18. On May 8, 1979, Plaintiff filed with the FERC, under its Docket No. CP 79–47, an Amended Certificate Application for construction of the Chiles Dome Storage Facility, and on November 26, 1979 the FERC entered its "Findings and Order after Statutory Hearing Issuing Certificate of Public Convenience and Necessity and Granting Petition to Intervene," in which it found all the facilities described in Plaintiff's application, as set forth in 17 above, to be adequate and necessary to provide the increased deliverability and ordered the issuance of a certificate of public convenience and necessity for the construction and operation of the Chiles Dome project.

19. On November 1, 1979, Plaintiff filed with the Oklahoma Corporation Commission (as that state's Oil and Gas Commission), under the Commission's Docket No. 26599, its application to utilize the Chiles Dome reservoir (the Wapanucka formation thereof) as a gas storage facility and pursuant to order entered on November 21, 1979 by that Commission, the Commission found the necessity for the use of Chiles Dome as a gas storage reservoir superior to the necessity for the production of the remaining reserves and thus authorized the use of Chiles Dome (the Wapanucka formation thereof) for the underground storage of natural gas and authorized Plaintiff to expropriate the remaining native gas in the reservoir, if necessary, and fixed the quantities of recoverable native gas remaining in the reservoir as of April 30, 1979 at a total of 703,934 MCF.

20. Prior to entry of the Oklahoma Corporation Commission's order of November 21, 1979, Plaintiff had undertaken the voluntary acquisition (rather than resorting to expropriation) of the remaining native gas contained in the reservoir.

A. Atlantic Richfield Company (ARCO) was the operator of each of the producing units in the Chiles Dome Field and owned a 71.1599% working interest in the Cody Gas Unit # 1 and the Cody Gas Unit # 2 and owned the entire working interest of Cody Gas Unit # 4.

B. By letter agreement dated November 22, 1978, Plaintiff agreed to purchase from ARCO all of its right, title

and interest in and to any remaining recoverable native gas underlying the above-referenced units at the price of $0.33 per thousand cubic feet ("MCF") and agreed as to the method of determining such reserves; at closing on August 28, 1980, Plaintiff paid to ARCO the sum of $131,845.85 in fulfillment of that obligation.

C. IBEX, Inc. (IBEX) was the owner of a 14.4201% working interest in the Cody Gas Unit # 1 and in the Cody Gas Unit # 2; by letter agreement dated March 1, 1979, Plaintiff agreed to purchase from IBEX all of its right, title and interest in and to any remaining recoverable native gas underlying the above-referenced units on the same terms and conditions as its agreement with ARCO and Plaintiff paid IBEX $28,527.00 on August 28, 1980 in fulfillment of that obligation.

D. Amoco Production Company (Amoco) was the owner of a 14.4200% working interest in the Cody Gas Unit # 1 and in the Cody Gas Unit # 2; by letter agreement dated June 5, 1979, Plaintiff agreed to purchase from Amoco all of its right, title and interest in and to any remaining recoverable native gas underlying the above-referenced units on the same terms and conditions as its agreement with ARCO and Plaintiff paid Amoco $28,527.00 on August 28, 1980 in fulfillment of that obligation.

E. In September, 1980, Plaintiff paid to the royalty owners the sum of $38,013.33 as their royalty interest for the remaining gas in the reservoir.

F. ARCO, as operator of the producing units of the Chiles Dome Field, had a contractual commitment with Boettcher Oil and Gas Company ("Boettcher") to deliver the remaining quantity of recoverable native gas in the Wapanucka formation of the Chiles Dome field to Boettcher at contractually agreed prices and pursuant to letter agreement dated November 22, 1978 between Plaintiff and ARCO, Plaintiff agreed to assume ARCO's obligations to Boettcher. In order to satisfy the contractual commitments with ARCO to deliver to Boettcher the remaining quantity of recoverable native gas in the Wapanucka formation of the Chiles Dome Field, and yet to retain that quantity of gas in the storage reservoir, Plaintiff:

1. Entered into a Gas Purchase Contract with ARCO agreeing to purchase the quantity of gas necessary to fulfill the contractual commitments to Boettcher, which gas was to be produced from the Chiles Dome Field but from a formation other than the Wapanucka formation, and Plaintiff was to pay ARCO the maximum lawful price therefor which could be charged pursuant to the Natural Gas Policy Act of 1978 as of the date of delivery thereof; and,

2. Entered into an Agreement with Boettcher, dated July 10, 1980, under which Plaintiff agreed to deliver a total of 432,000 MCF of gas to Boettcher at times and in amounts set forth in the Boettcher Gas Purchase Contract dated August 5, 1964, with Boettcher paying to Plaintiff $0.53 per MCF, escalating $0.03 per MCF annually effective January 1, 1981.

21. Prior to its filings with the FERC and the Oklahoma Corporation Commission, Plaintiff had prepared extensive studies to determine the most economical method of constructing the gas storage facility within the parameters of approximately 11.5 to 12 billion cubic feet of working gas, minimum daily deliverability of 125 MMCF and at least a pressure of 610 pounds per square inch, gauge ("psig") for injection into the Plaintiff's transmission line number "AD." Those studies showed, as refined to the date of filing with the FERC for its certification, that the lowest cost of service per MCF was obtained by the utilization of an average minimum wellhead flowing pressure of 355 psig, which required 14 BCF of cushion gas for the flow rates involved, and

the availability of 6,750 horsepower of surface compression.

22. The largest single item of cost for the construction of the Chiles Dome gas storage facility, regardless of the wellhead pressure considered, was the cushion gas.

23. On August 7, 1980, the Plaintiff notified the FERC that construction of the Chiles Dome gas storage facility was completed on July 30, 1980 and placed in service on that date.

24. During the calendar year 1980, Plaintiff purchased at a cost of $9,689,239.16 and injected into Chiles Dome 5,979,277 MCF of cushion gas as part of that storage facility, and purchased at a cost of $328,305.20 the 3,499,381 MCF of native gas remaining in the storage reservoir as of the date of closing with ARCO, IBEX and Amoco.

25. The 5,979,277 MCF of cushion gas purchased and injected into Chiles Dome by Plaintiff during 1980 is classified as recoverable cushion gas and, pursuant to the FERC Uniform System of Accounts, the $9,689,239.16 cost thereof is included in FERC Account # 117—Gas Stored Underground-Noncurrent, which is one of the "Utility Plant" accounts.

26. The 3,499,381 MCF of native gas remaining in Chiles Dome and purchased by the Plaintiff in 1980, consisted of 512,774 MCF of recoverable native gas and 2,986,607 MCF of non-recoverable native gas. The $134,642.29 cost of the recoverable native gas is included in FERC Account # 117—Gas Stored Underground-Noncurrent and the $193,662.91 cost of the non-recoverable native gas is included in FERC Account # 352.3—Non-Recoverable Gas, which account is also one of the "Utility Plant" accounts. The cost of the recoverable native gas was adjusted in subsequent years to account for the additional cost incurred by Plaintiff in performing on the Boettcher contract (the difference between the amounts paid to ARCO [Paragraph 20(F)(1) above] and the amounts received from Boettcher [Paragraph 20(F)(2) above]).

27. The cushion gas, whether recoverable or non-recoverable, is an integral part of the Chiles Dome gas storage facility and is classified pursuant to the FERC Uniform System of Accounts as part of the "Utility Plant."

28. Plaintiff was required to pay and paid fees to the FERC, under the provisions of 18 CFR § 159.2(a) and § 159.2(b), based on the cost of construction of the Chiles Dome facility which cost of construction included the cost of the native and injected cushion gas, both recoverable and non-recoverable.

29. The cost of cushion gas, both recoverable and nonrecoverable, constitutes a part of the gas utility plant and is included as such in the rate base under the provisions of 18 CFR § 154.63(f).

30. The recoverable cushion gas carried in the Plaintiff's FERC Account # 117 is part of the property pledged to secure the payment of the Plaintiff's bond indebtedness under the Eleventh Supplemental Indenture by and between Arkansas Louisiana Gas Company and Morgan Guaranty Trust Company of New York and Commerce Bank of Kansas City dated as of September 1, 1970 (Supplemental to Indenture dated as of September 1, 1953), as Trustee, and cannot be sold or otherwise disposed of by the Plaintiff except with consent of the Trustee under the terms and conditions of the Indenture.

31. Both recoverable and non-recoverable cushion gas serve the same function in a gas storage facility.

32. The cushion gas, both recoverable and non-recoverable, and surface compression serve the same general function in a gas storage facility.

33. The cushion gas, both recoverable and non-recoverable, contained in the Chiles Dome gas storage facility is tangible property used as an integral part of furnishing gas services and the transportation of gas; additionally, it is a part of a facility the whole of which constitutes a natural gas bulk storage facility used by Plaintiff in its business of furnishing gas service.

34. The cushion gas, both recoverable and non-recoverable, contained in the Chiles Dome gas storage facility is not a building or its structural component.

35. In its final design, the Chiles Dome gas storage facility was to store 12 BCF of working gas with minimum daily deliverability of 133 MMCF to provide for approximately 90 days of peak demand.

36. The cost of working gas, when injected into an underground storage facility, is carried in FERC Account # 164.1—Gas Stored Underground-Current, which is one of the "Current and Accrued Asset" inventory accounts.

37. The Plaintiff is an accrual basis taxpayer with its tax year ending on December 31 of each year which files an annual Form 1120, U.S. Corporate Income Tax Return with the Internal Revenue Service in Austin, Texas on the extended due date thereof of September 15 of the year following the close of the tax year.

38. On its Form 1120 timely filed for the tax year 1978, the Plaintiff elected under the provisions of Section 46(d)(6) of the Code [26 U.S.C. § 46(d)(6)] to claim investment tax credit on qualified progress expenditures in connection with the construction of the Chiles Dome gas storage facility.

39. Plaintiff established, maintained and fully funded for the taxable year 1980, an employee stock ownership plan satisfying the provisions of Section 48(n)(1)(B) of the Code [26 U.S.C. § 48(n)(1)(B)] regarding the qualified matching employee contributions, and was thus entitled to investment tax credit at the rate of 11½ of its qualified investment property additions for its taxable year 1980.

40. The Plaintiff on its timely filed Form 1120 for the taxable year 1980 claimed investment tax credit on the $193,662.91 cost of the 2,986,607 MCF of non-recoverable native cushion gas contained in the Chiles Dome facility which credit was allowed by the Defendant in the total amount of $22,271.23.

41. The Plaintiff on the Form 1120X for the taxable year 1980, filed on September 16, 1981, claimed additional investment tax credit in the amount of $1,129,746.37 based on the $134,642.29 cost of the 512,774 MCF of recoverable native cushion gas contained in the Chiles Dome facility and the $9,689,239.16 cost of the recoverable cushion gas injected into the Chiles Dome facility.

LEGAL ISSUES:

The pivotal legal issue to be resolved is whether recoverable cushion gas is an asset (1) which has a useful life of more than seven years and (2) is property with respect to which depreciation is allowable (both requirements being set forth in Internal Revenue Code ("IRC"), § 48(a)(1)). If the recoverable cushion gas is subject to depreciation and has a useful life of more than seven years [See, IRC § 46(c)], Arkla is entitled to an investment tax credit for tax year 1980, as provided for in IRC § 38. Thus, if Arkla is entitled to an investment tax credit for its investment in recoverable cushion gas, it is entitled to a refund on its 1980 income tax return in the stipulated amount of $1,129,746.37, plus legal interest.

ANALYSIS:

1. Burden of Proof

■ In an action in which a taxpayer seeks a refund of income taxes paid, the taxpayer has the burden of proof of establishing his right to recovery. In the case of *Mallette Brothers Construction Co., Inc. v. United States*, 695 F.2d 145 (5th Cir. 1983), the court set out this burden:

> A taxpayer seeking a refund must demonstrate not only the error in the asserted deficiency but also the amount of the refund to which he is entitled, *i.e.*, the correct amount of his tax liability.

695 F.2d at 149; *U.S.A. v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). In the case at bar, the parties have stipulated the amount of refund to which Arkla is entitled if it prevails on the merits. Therefore, Arkla need only establish that it is entitled to the refund claimed as a matter of law.

This is not a case in which a taxpayer challenges the validity of a portion of the IRC or a regulation promulgated thereunder. For this reason, there is no need to address the issues raised by the government in its brief concerning the presumed validity of a Code provision or an IRS regulation. The sole issue is whether the cost of recoverable cushion gas is subject to an investment tax credit under the appropriate Code provisions.

## 2. Statutory provisions

The court concurs in Arkla's assertion in its memorandum in support of the motion for summary judgment that the IRC provisions applicable in this case are "virtually indecipherable." However, there is no disagreement between the parties as to which portions of the Code govern the outcome of this case.

Provisions for an investment tax credit are made in IRC § 38, which states, "there shall be allowed, as a credit against a tax imposed by this chapter, the amount determined under Subpart B of this part." Subpart B includes IRC §§ 46–48, and makes an attempt to specify rules controlling the investment tax credit.

Arkla and the government have stipulated in the Pretrial Order that cushion gas satisfies the requirements of IRC § 48(a)(1)(B)(iii). The effect of this stipulation is to classify cushion gas as "Section 38 property," defined as property for which investment tax credit is allowable.

In addition to the above classification, the cushion gas at issue here must meet the requirements of the last sentence of IRC § 48(a)(1), which states:

> Such term [Section 38 property] includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of three years or more.

In order to take the full amount of the investment tax credit, IRC § 46(c) requires that the subject property have an estimated useful life of more than seven years.

The statutory provisions bring into focus the critical issue to be resolved in this case: whether recoverable cushion gas is subject to depreciation and has an estimated useful life of more than seven years. Arkla argues in the affirmative on both questions, while the government takes a position to the contrary.

## 3. Statutory Application

### A. Cushion Gas as Inventory

■ As a preliminary point, it appears that the government has abandoned its early position that recoverable cushion gas constitutes an item of inventory. The key determination to be made when classifying an asset as inventory is to ascertain the purpose for which the asset was acquired. There is no question that the cushion gas, both recoverable and non-recoverable, was acquired by Arkla for the purpose of ensuring sufficient pressure in the Chiles Dome facility to provide the optimum deliverability of natural gas to Arkla's customers. The stipulations in the Pretrial Order make it clear that the cushion gas was not purchased for resale in the ordinary course of Arkla's business.

Revenue Ruling 79–188 is authority for the proposition that cushion gas is not inventory:

> Section 471 of the Code and regulations thereunder provide that raw materials are inventoriable only if they have been acquired for the purpose of sale in the ordinary course of business or for the purpose of being physically incorporated into merchandise intended for sale. Consequently, the purpose for which raw material is purchased is a major factor in determining whether such material is inventoriable by the taxpayer. *See Latimer-Looney Chevrolet, Inc. v. Commissioner,* 19 C.C. 120 (1952), acq. 1953–1, C.B. 5.

79–1 C.B. 191. Since the cushion gas purchased by Arkla had the specific purpose of providing a required pressure base in the Chiles Dome facility, it must be classified

as a capital asset, and not an item of inventory.

### B. Depreciation of Cushion Gas

■ IRC § 167 provides the guidelines for determining whether depreciation can be allowed on a particular asset. Subsection 167(a) specifies:

> There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)— (1) of property used in the trade or business, or (2) of property held for the production of income.

There is no question that the Chiles Dome facility and the cushion gas therein is property used in Arkla's trade or business, and is property held for the production of income. The government, however, argues that cushion gas is not an asset subject to exhaustion, wear and tear, or, presumably, obsolescence.

The fact stipulations in the Pretrial Order indicate that the government allowed an investment tax credit for *non-recoverable* cushion gas contained in the Chiles Dome facility. This allowance implies that the cushion gas, at least the non-recoverable component, is subject to depreciation. For the government to argue that natural gas, as a generic entity, is not subject to depreciation because it never wears out contradicts its allowance of an investment tax credit for the non-recoverable cushion gas.

The government's assertions are also inconsistent with the holding by the Court of Claims in the analogous case of *Transwestern Pipeline Company v. U.S.A.*, 639 F.2d 679 (Ct.Cl.1980). The *Transwestern* case overruled Revenue Ruling 68–620 which classified "line pack gas" in an interstate gas pipeline as "merchandise in transit." Line pack gas is that quantity of natural gas pumped into an interstate pipeline which produces sufficient line pressure to allow natural gas to be transmitted through the pipeline. The *Transwestern* court expressly stated that line pack gas and cushion gas in underground storage facilities performed precisely the same function. Without line pack gas or cushion gas, these natural gas facilities would be non-functional. Thus, the *Transwestern* court held that line pack gas was a capital asset and not merchandise in transit. The court went on to provide that depreciation would be allowable on the line pack gas, a holding which cannot be reconciled with the government's contentions that the cushion gas is not subject to depreciation.

### C. Salvage Value of Cushion Gas

■ In *Transwestern*, the court also addressed an issue raised by the government in this case. Specifically, the government asserts that depreciation is not allowable on the cushion gas because the salvage value would be greater than or equal to the original cost of the cushion gas. Superficially, this argument is attractive. However, logical analysis reveals a serious flaw. The government attempts to differentiate between recoverable and non-recoverable cushion gas, although each performs precisely the same function in the underground gas storage facility. The *Transwestern* case did not distinguish between recoverable and non-recoverable line pack gas. The court determined that the proper methodology for computing salvage value would be to deduct the value of recoverable line pack gas from the total cost of line pack gas. This court finds that such a "net" approach to determining the salvage value of Arkla's cushion gas is appropriate here.

The total cost of Arkla's cushion gas must be computed to be the cost of purchasing the native cushion gas, plus the cost of the cushion gas injected into the Chiles Dome facility. It is important to remember that without the cushion gas, recoverable *and* non-recoverable, the facility could not serve its designed purpose. [*See*, Discussion in Arkla's Memorandum in Support of Motion for Summary Judgment, pp. 9–10, and affidavit of Edward N. Henderson, pp. 8–9, Exhibit No. 1, Arkla's Memorandum.] Thus, it is inappropriate to distinguish between recoverable and non-recoverable cushion gas for computing the

salvage value. Thus, the salvage value of the Chiles Dome cushion gas is the total cost of *all* cushion gas, less the value of the recoverable cushion gas. The result of this computation is the non-recoverable portion of the cushion gas in the Chiles Dome facility. This is the quantity of gas upon which the government has *already* allowed an investment tax credit, and for which, presumably, depreciation is allowable.

An analogy to another type of business is appropriate to explain this court's perception of the issues involved here. Assume that a taxpayer is in the business of steel fabrication. In order to build a facility in which to fabricate steel, the taxpayer must purchase fabricated steel to erect the facility. There can be no question that the steel fabricator would be allowed depreciation on the newly constructed facility, and that the salvage value of the fabricated steel used in the facility would be used in the depreciation computations. The fact that the taxpayer is in the steel fabrication business has no impact on this salvage value computation. An identical result would occur when a construction salvage contractor who sells used brick uses brick to build his place of business.

### D. Useful Life of Cushion Gas

■ The government asserts another argument that the cushion gas has no fixed or determinable useful life; therefore, it cannot be Section 38 property. Again, the government's argument falls under its own weight. It is difficult to comprehend how the government could allow an investment tax credit on the non-recoverable cushion gas, and argue that the recoverable cushion gas has no useful life and is not subject to the investment tax credit.

In the *Transwestern* case, the court found that line pack gas had the same useful life as the pipeline into which the gas was injected. Similarly, the cushion gas used in the Chiles Dome facility must have a useful life equal to that of the facility and its related pipelines. In this case, Arkla has submitted the deposition of Dr. Mehmet Rasin Tek. Dr. Tek reiterates the *Transwestern* determination that line pack gas and cushion gas perform identical functions. He also establishes that the purposes of recoverable and non-recoverable cushion gas are the same. More importantly, Dr. Tek is of the opinion—an opinion shared by this court—that the useful life of the Chiles Dome facility and its related pipelines is between 40 and 50 years. This opinion is unrebutted by the government.

Arkla has also submitted the affidavit of Edward N. Henderson, a mechanical engineer and vice president of Arkla, Inc. In his affidavit, Mr. Henderson discussed the useful life computations made on Arkla's transmission lines related to the Chiles Dome facility. Based on these computations and studies made by an independent engineering firm, Mr. Henderson asserted that the transmission lines have an approximate useful life of 51.7 years. This court is convinced, as was the *Transwestern* court, that the useful life of cushion gas is equal to the useful life of the storage facility in which it is contained, which includes the pipelines associated with the facility.

In order to qualify for the full investment tax credit, the capital asset must have a useful life in excess of seven years. Arkla has established that the estimated useful life of the Chiles Dome facility and its associated pipelines and, logically, the cushion gas in the facility, has an estimated useful life well in excess of seven years. The only reasonable conclusion is that the cushion gas qualifies for the investment tax credit.

Treasury Regulation 1.167(a)–1(b) contains language which reinforces this conclusion that the cushion gas has a determinable useful life, and that that useful life is in excess of seven years:

> [T]he estimated useful life of an asset is not necessarily the useful life inherent in the asset *but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income.*

(Emphasis added.) In this case, the natural gas at issue was purchased for the purpose

of increasing the subsurface pressure in the Chiles Dome facility. This cushion gas will be useful to Arkla for this purpose *only* as long as the Chiles Dome facility and its associated pipelines are in use. As noted above, the cushion gas has a determinable useful life—a useful life of more than seven years.

SUMMARY:

■ As noted by the parties, there are no judicial pronouncements in the jurisprudence on the issue of whether cushion gas is a capital asset subject to depreciation and the investment tax credit. However, the *Transwestern* case provides an excellent analogy, and is persuasive in the resolution of the dispute in this case. Further, the court relies on common sense in determining that cushion gas must be considered as a capital asset, and that the Chiles Dome facility, the related pipelines and the cushion gas must be considered a "system" of component parts. In the case of *Glaze v. U.S.*, 641 F.2d 339 (5th Cir. 1981), the court approved the use of common sense in resolving facially confusing tax issues:

> One must be careful not to stray too far into the forest of technical legal reasoning so as to obscure the light of common sense. Common sense should play a part in all court decisions, including those involving the construction of tax statutes.

641 F.2d at 344.

The application of common sense leads inexorably to the conclusion that recoverable cushion gas is a capital asset; is subject to depreciation; has a determinable useful life in excess of seven years; and constitutes Section 38 property. To distinguish between recoverable and non-recoverable cushion gas, and to allow depreciation and the investment tax credit on one but not the other, flies in the face of common sense.

CONCLUSION:

For the reasons set forth above, the motion for summary judgment on behalf of Arkla, Inc. is GRANTED, and the motion for summary judgment on behalf of the United States is DENIED. According to the stipulations in the Pretrial Order, judgment is entered in favor of Arkla in the amount of $1,129,746.37, plus legal interest. An Order consistent with this Memorandum Ruling will issue herewith.